UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

AARON RUBENSTEIN,

                     Plaintiff,

          v.

INTERNATIONAL VALUE ADVISERS, LLC,
CHARLES DE VAULX, CHARLES DE
LARDEMELLE, and JOHN DOE, *an unidentified IVA
client*,

                     Defendants,

          and

ADTALEM GLOBAL EDUCATION SERVICES (f/k/a
DEVRY EDUCATION GROUP, INC.),

                 Nominal Defendant.

------------------------------------------------------------------- X

18 Civ. 81 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

The plaintiff in this case, a corporate shareholder, seeks to recoup for the corporation "short-swing" profits that he claims were unlawfully obtained by a corporate insider. Plaintiff Aaron Rubenstein brings this case in the right and for the benefit of nominal defendant AdTalem Global Education Services, f/k/a DeVry Education Group, Inc. ("DeVry") pursuant to § 16(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78p(b). He sues defendants International Value Advisers, LLC ("IVA"), an investment advisor; Charles de Vaulx ("de Vaulx") and Charles de Lardemelle ("de Lardemelle"), who were portfolio managers at IVA; and John Doe, an IVA client in whose account ("the "JD Account") there were trades of DeVry stock. Rubenstein alleges that IVA, de Vaulx and de Lardemelle (collectively, the "IVA

1

Defendants"), and John Doe were insiders of DeVry by virtue of their combined beneficial ownership of DeVry, which exceeded 10% during the relevant period. Rubenstein alleges that the IVA Defendants and John Doe constituted a "group" within the meaning of § 13(d) of the Exchange Act, and made short-swing trades in Doe's account that, in light of their "group" status, violated § 16(b). Rubenstein seeks disgorgement by Doe of the profit he[1] made from those trades, and by the IVA Defendants of any benefit they received from those trades under any performance-based fee arrangement with Doe.

The IVA Defendants now move to dismiss. They do not dispute that they constituted a control group with respect to DeVry. But, they argue, on the facts pled, John Doe never became part of such a control "group" with them. All that is pled about Doe, they note, is that he was an IVA client who gave IVA discretion to manage his money. They argue that these allegations do not adequately plead, as would be required for Doe to be a member of a control group, that Doe ever "agreed to act together" with the IVA Defendants to advance their disclosed control purpose regarding DeVry.

For the reasons that follow, the Court agrees, and on this basis grants the motion to dismiss. The Court separately denies as moot, and as belated and uninvited, the parties' respective attempts—made in supplemental letters following briefing on the motion to dismiss—to move for summary judgment.

---

[1] It is not clear from the pleadings whether John Doe, whose true name plaintiff does not know, is a person or entity. Given the complaint's use of the first-name pseudonym "John," the Court refers to John Doe as a "he."

## I.    Background[2]

### A.    The Parties

Rubenstein is a DeVry shareholder. Dkt. 1 ("Compl.") ¶ 12.

DeVry is a private educational institution that offers both in-person and online degree programs. *Id.* ¶ 13. DeVry's stock is publicly traded. "This action is brought in the right and for the benefit of DeVry, which is named as Nominal Defendant solely to have all necessary parties before the Court." *Id.*

IVA is an investment advisor. *Id.* ¶ 14. IVA was, from at least June 13, 2016 until, it appears, October 3, 2017,[3] the beneficial owner of 19.5% of DeVry common stock, inclusive of the DeVry stock in the JD Account. *Id.* ¶¶ 21, 28; *see also* Dkt. 16-1 ("Schedule 13D") at 2–3.

John Doe is the owner of the JD Account, for which IVA serves as investment advisor. *Id.* ¶ 4, 14. As pled, IVA's portfolio managers are "authorized to make investment and voting decisions on behalf of [John Doe]." *Id.* ¶ 14. This includes acquiring, holding, and disposing of shares. *Id.* ¶ 4.

De Vaulx and de Lardemelle are portfolio managers at IVA who manage the JD Account. *Id.* ¶¶ 3, 14.

---

[2] The facts set out here are drawn from Rubenstein's complaint, Dkt. 1 ("Compl."), and the June 22, 2016 Schedule 13D, incorporated by reference in the complaint and attached as Exhibit 1 to the Declaration of Robin L. Muir in Support of the Defendants' Motion to Dismiss ("Muir Declaration"). *See DiFolco v. MSNBC Cable LLC*, 662 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). The Court does not rely on the other exhibits attached to the Muir Declaration, which are not properly considered on a motion to dismiss a § 16(d) claim. *See Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007).

[3] Although the Complaint is oblique on this point, it appears to admit that, effective October 3, 2017, IVA no longer beneficially owned 10% of DeVry common stock. *Id.* ¶ 28.

3

**B.    Factual Background**

**1.    The IVA Defendants and DeVry**

On June 22, 2016, the IVA Defendants filed a Schedule 13D with the SEC. In it, they disclosed their aggregate beneficial ownership of approximately 19.5% of the outstanding shares of DeVry common stock. *Id.* ¶ 21. These shares included, in addition to shares owned by the IVA defendants, those "shares of DeVry in the [JD Account] held within IVA's custody and discretionary voting and investment authority by agreement with the unidentified IVA client and the John Doe Defendant." *Id.* ¶ 22.

The Schedule 13D document recited the IVA Defendants' "control purpose" with respect to DeVry. As to that, the Schedule 13D document stated:

> Consistent with its investment research methods and evaluation criteria, the Reporting Persons [the IVA Defendants] have discussed and may further discuss such matters [referring to, *inter alia*, DeVry's operations, prospects, business development, management, competition, and corporate strategies] with management or directors of the Issuer [DeVry], other shareholders, industry analysts, existing or potential strategic partners or competitors, investment and financing professionals, sources of credit and other investors. Such factors and discussions may materially affect, and result in, the [IVA Defendants' (sic)] modifying their ownership of [DeVry's] Shares, exchanging information with [DeVry] pursuant to appropriate confidentiality or similar agreements, proposing changes in [DeVry's] operations or board of directors, governance or capitalization, or in proposing one or more of the other actions described in subsections (a) through (j) of Item 4 of Schedule 13D [which refers to and requires disclosure of any plans with "change of control" potential, e.g., board appointments, recapitalizations, and major corporate transactions] . . . .
>
> The [IVA Defendants] reserve the right to formulate other plans and/or make other proposals, and take such actions with respect to their investment in [DeVry], including any or all of the actions set forth in paragraphs (a) through (j) of Item 4 of Schedule 13D, or acquire additional Shares or dispose of all the Shares beneficially owned by them, in the public market or privately negotiated transactions. The [IVA Defendants] may at any time reconsider and change their plans or proposals relating to the foregoing.

*Id.* ¶ 21. The Schedule 13D was signed by the IVA defendants but not John Doe. *See* Schedule 13D at 15.

On June 29, 2016, DeVry and IVA entered into a "Support Agreement" whereby IVA Managing Partner Michael W. Malafronte would be appointed to the DeVry Board of Directors as IVA's representative and "deputy" as long as IVA continued to have a beneficial ownership of more than 10% of the outstanding common DeVry stock. *See id.* ¶ 27.

On October 3, 2017, DeVry and IVA amended the Support Agreement. The amended Agreement provided that Malafronte would retain his board seat as IVA's deputy "for the purpose of representing the interests and advancing the investment goals adopted by or on behalf of all Defendants, including [John Doe], notwithstanding their collective beneficial ownership of less than 10% of DeVry common stock." *Id.* ¶ 28.

As of the filing of the Complaint, Malafronte was still on the DeVry Board. *Id.*

### 2.     The John Doe Account Managed by the IVA Defendants

The Complaint alleges that IVA managed the John Doe Account on Doe's behalf and that IVA had discretion as to the acquisition, holding, voting, and disposition of shares held in that account. *See* Compl. ¶¶ 4, 14, 15. Otherwise, the Complaint lacks concrete factual allegations as to that account and accountholder. It does not allege when Doe authorized IVA to make investment decisions on behalf of the JD Account, or whether the trading authority given by Doe to the IVA Defendants was general or specific to trades in a specific issuer or issuers such as DeVry. The Complaint conclusorily alleges that Doe "understood, agreed to, and authorized— either affirmatively, or through silence and the continued designation of the IVA Defendants as their agents and discretionary investment managers—the DeVry 'change of control' strategy implemented by the IVA Defendants." *Id.* ¶ 24.

### 3.    Trading of DeVry Stock by Accounts Managed by IVA

On 44 different days spanning June 16, 2016 and December 22, 2016, accounts managed by IVA, including the JD Account, sold a number of shares of DeVry Stock. The Complaint does not specify which accounts made which sales. The Complaint lists the sales as follows:

| Date | No. Shares Sold | Price/share |
|------|-----------------|-------------|
| June 16, 2016 | 11,096 | $17.33 |
| July 18, 2016 | 24,578 | $22.06 |
| August 16, 2016 | 55,022 | $22.12 |
| August 22, 2016 | 15,511 | $24.80 |
| August 22, 2016 | 20,858 | $24.64 |
| August 23, 2016 | 43,360 | $24.55 |
| August 24, 2016 | 65,985 | $23.98 |
| August 25, 2016 | 52,761 | $23.82 |
| October 10, 2016 | 6,735 | $23.51 |
| October 11, 2016 | 426 | $23.50 |
| October 13, 2016 | 7,565 | $23.52 |
| October 26, 2016 | 7,791 | $23.53 |
| October 27, 2016 | 19,355 | $23.53 |
| October 28, 2016 | 1,885 | $23.51 |
| November 2, 2016 | 7,867 | $23.79 |
| November 3, 2016 | 18,880 | $23.53 |
| November 7, 2016 | 10,315 | $23.62 |
| November 8, 2016 | 24,014 | $23.55 |
| November 9, 2016 | 229,590 | $25.40 |
| November 10, 2016 | 81,034 | $26.54 |
| November 11, 2016 | 92,305 | $27.93 |
| November 14, 2016 | 35,046 | $27.91 |
| November 15, 2016 | 19,467 | $27.84 |
| November 16. 2016 | 22,053 | $28.02 |
| November 17, 2016 | 84,499 | $28.35 |
| November 18, 2016 | 7,709 | $28.27 |
| November 21, 2016 | 48,164 | $28.01 |
| November 23, 2016 | 121,604 | $29.33 |
| November 29, 2016 | 4,698 | $29.60 |
| December 1, 2016 | 2,460 | $30.00 |
| December 2, 2016 | 43,597 | $29.69 |
| December 5, 2016 | 48,278 | $29.70 |
| December 7, 2016 | 6,039 | $31.18 |
| December 7, 2016 | 79,201 | $31.25 |
| December 8, 2016 | 84,271 | $31.16 |
| December 12, 2016 | 9,328 | $31.28 |
| December 13, 2016 | 55,066 | $31.13 |

| December 14, 2016 | 109,769 | $30.97 |
| December 15, 2016 | 96,202 | $31.48 |
| December 16, 2016 | 21,250 | $32.05 |
| December 19, 2016 | 108,843 | $32.13 |
| December 20, 2016 | 42,479 | $32.33 |
| December 21, 2016 | 33,068 | $31.98 |
| December 22, 2016 | 38,675 | $31.88 |

*Id.* ¶ 34.

The Complaint alleges that one purchase of stock was made: On July 18, 2016, the JD Account purchased 31,847 shares of DeVry stock at $22.04 per share. *Id.* ¶ 33. There are no allegations that any DeVry stock was sold out of the other accounts over which IVA was a beneficial owner.

### C.     Procedural History

On January 5, 2017, Rubenstein filed the Complaint, on behalf of nominal defendant DeVry, against IVA, de Vaulx, de Lardemelle, and John Doe, to recover short-swing profits made between June 16, 2016 and December 22, 2016 from Doe's purchase and Doe and the IVA Defendants' sale of DeVry's stock.[4] On March 6, 2018, the IVA Defendants moved to dismiss. *See* Dkts. 14–16.

On March 13, 2018, the Court issued an order notifying Rubenstein of his right to file, in lieu of a brief in opposition, an amended complaint in response to the motion to dismiss, while noting that "[n]o further opportunities to amend will ordinarily be granted." Dkt. 18. On March 26, 2018, Rubenstein filed a letter asking that he be given leave to amend the complaint at a later

---

[4] The Complaint alleged that, on November 30, 2016, Rubenstein, through counsel, had made a demand on DeVry to pursue such an action, which DeVry declined. *See* Compl. ¶ 19 ("Plaintiff's counsel was informed, first by counsel for DeVry and subsequently by counsel for IVA, that the Defendants deny any liability under Section 16(b) of the Act.").

date for the limited purpose of adding John Doe's proper name. Dkt. 20. The following day, the

Court adjourned *sine die* the deadline to amend the complaint for that limited purpose. Dkt. 21.

On April 10, 2018, Rubenstein filed his brief in opposition. Dkt. 26 ("Pl. Br."). On April

25, 2018, the IVA Defendants filed their reply. Dkt. 30.

On May 2, 2018, the Court addressed the pending motion with counsel at a status

conference.[5] The Court also extended the deadline for nominal defendant DeVry to respond to

the complaint until after the resolution of the motion to dismiss. *See* Dkt. 32.

On May 4, 2018, the Court issued an order seeking supplemental letter briefing on an

issue unaddressed by the parties' briefs: whether the IVA Defendants could be held liable, under

Rubenstein's complaint, even if they had not formed a "group" with John Doe. *See* Dkt. 33.

On May 11, 2018, the IVA Defendants filed their letter. Dkt. 34. It argued that (1) the

Complaint does not pursue a theory of liability for the IVA Defendants other than the claim that

they and John Doe had formed a control group; and (2) in any event, no other § 16(b) claim

could lie against the IVA Defendants because they lack a pecuniary interest in the JD Account.

*Id.* at 2–4. In support of the latter argument, the IVA Defendants attached an Investment

Management Agreement between them and John Doe, which, they claimed, demonstrates that

they receive an asset-based fee for managing the JD Account and thus cannot be held liable

under SEC Rule 16a-1(a)(2) for any short-swing profits made by that account. *See* Dkts. 34-1,

34-2. The IVA Defendants asked the Court to convert the pending motion to dismiss into a

---

[5] At the conference, Rubenstein's counsel acknowledged his understanding that, having foregone
the right to amend, in the event of dismissal he would not necessarily be given leave to file an
amended complaint.

motion for summary judgment and, for that purpose, to consider the Investment Management Agreement. Dkt. 34 at 4.[6]

On May 18, 2018, Rubenstein filed a response. Dkt. 35. He reiterated the Complaint's claim that the IVA Defendants had entered into a control "group" with John Doe, requiring Doe to disgorge any short-swing profits from the DeVry trades. *See generally id.* He asked the Court to enter summary judgment in his favor against Doe. *Id.* at 4. He did not, however, argue that the IVA Defendants could be held liable for any short-swing profits independent of the Complaint's theory of § 16(b) "group" liability with Doe.

## II.     Legal Standards

### A.     Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. For the purpose of resolving the motion to dismiss, the Court must assume all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff. *See Koch*, 699 F.3d at 145 (2d Cir. 2012). However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

---

[6] As the IVA Defendants correctly note, this management agreement is not cognizable on a motion to dismiss. *Id.* The Court has not considered it here.

**B.     Section 16(b)**

Section 16 of the Exchange Act "was enacted to prevent corporate insiders from using non-public information to 'speculate in the stock of the corporations to which they owe a fiduciary duty.'" *Donoghue v. Centillium Commc'ns, Inc.*, No. 05 Civ. 4082 (WHP), 2006 WL 775122, at *2 (S.D.N.Y. Mar. 28, 2006) (quoting Senate Comm. on Banking & Currency, Stock Exchange Practices, S. Rep. No. 73–1455, at 68 (1934)). The statute compels the "disgorgement to the company of any profit derived from the matching of any purchase and any sale of an 'equity security' (other than an exempted security) within a six-month period by a statutory insider." *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998); *see also Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 43 (2d Cir. 2012); *Steel Partners II, L.P. v. Bell Indus., Inc.*, 315 F.3d 120, 123 (2d Cir. 2002); *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 320 (2d Cir. 1998). Either the issuer or (as here) a shareholder acting derivatively on the issuer's behalf may bring a lawsuit under § 16(b). *Gwozdzinsky*, 156 F.3d at 308; *Donoghue v. Murdock*, No. 13 CIV. 1224 PAE, 2013 WL 4007565, at *3 (S.D.N.Y. Aug. 6, 2013).

To establish liability under § 16(b), a plaintiff must prove "that there was (1) a purchase and (2) a sale of securities (3) by [an insider] (4) within a six-month period." *Gwozdzinsky*, 156 F.3d at 308; *Murdock*, 2013 WL 4007565, at *3. An insider is either (1) any beneficial owner of more than 10% of any class of non-exempt equity security, (2) anyone who is a director of the issuer of any such security, and (3) anyone who is an officer of the issuer of any such security. 15 U.S.C. § 78p(a)(1); *see Gwozdzinsky*, 156 F.3d at 308 n.3; *Magma Power*, 136 F.3d at 320.

As these elements reflect, § 16(b) imposes strict liability. It imposes a blanket ban on short-term trading by insiders without regard to whether the insider in fact had—or acted upon—inside information. The statute thus aims "to remove any temptation for insiders to engage in

transactions which 'may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information.'" *Magma Power*, 136 F.3d at 320 (quoting *Kern Cnty. Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 594 (1973)). In light of § 16(b)'s strict liability feature, the Supreme Court has cautioned against interpreting the statute so as to exceed its "narrowly drawn limits," "even though in some cases a broader view of statutory liability could work to eliminate an evil that Congress sought to correct through § 16(b)." *Gollust v. Mendell*, 501 U.S. 115, 122 (1991) (internal quotations omitted).

### C. The Definitions of "Beneficial Owner" under Section 16(b)

Defendants' liability under § 16(b) for short-swing trading, on the facts here, thus turns on whether John Doe qualifies as an "insider," and in particular whether he—in conjunction with the IVA Defendants—qualified as a "beneficial owner" of DeVry stock.

The Exchange Act does not itself define the term "beneficial owner." *Feder v. Frost*, 220 F.3d 29, 32 (2d Cir. 2000). However, the Securities and Exchange Commission has promulgated rules under § 16 that define that term. There are two such definitions. The Second Circuit has explained why:

> Two definitions of "beneficial owner" were deemed necessary by the Commission because of the different uses to which the term is put in Section 16. The first use is to determine who is a ten-percent beneficial owner and therefore a statutory insider. The second use is the determination of which transactions . . . trigger[] liability under Section 16(b).

*Feder*, 220 F.3d at 33; *see also Rubenstein v. Berkowitz*, No. 17-CV-821 (JPO), 2017 WL 6343685, at *2 (S.D.N.Y. Dec. 11, 2017) ("The SEC rule[s], somewhat confusingly, has two definitions of 'beneficial owner.'").

### 1. Definition for Purpose of Determining Statutory Insiders

The SEC's first definition, used for determining who is a 10% owner and therefore a statutory insider, "begins by adopting the definition of beneficial owner that governs under

§ 13(d)" of the Exchange Act. *Egghead.Com, Inc. v. Brookhaven Capital Mgmt. Co.*, 340 F.3d 79, 84 (2d Cir. 2003). The definition then exempts certain classes of securities holders, such as registered investment advisors like IVA, from being treated as the beneficial owner of shares held "for the benefit of third parties or in customer or fiduciary accounts in the ordinary course of business." 17 C.F.R. § 240.16a-1(a)(1). It does so, however, only so as long as those "shares are acquired by such institutions . . . without the purpose or effect of changing or influencing control of the issuer.'" *Id.*

Under § 13(d), a "beneficial owner" is "any person who [] directly or indirectly . . . has or shares: (1) [v]oting power which includes the power to vote, or to direct the voting of, such security; and/or (2) [i]nvestment power which includes the power to dispose, or to direct the disposition of, such security." 17 C.F.R. § 240.13d-3(a)(1), (2).

A beneficial owner can but need not be a single person or entity. "When two or more persons act as a . . . group for the purpose of acquiring, holding, or disposing of securities of an issuer, such . . . group shall be deemed a 'person' for the purposes of this subsection," 15 U.S.C. § 78m(d)(3), and their "shares will be aggregated for purposes of determining whether § 16's ten-percent beneficial-ownership threshold is reached," *Greenfield v. Criterion Capital Mgmt., LLC*, No. 15-CV-3583-PJH, 2017 WL 2720208, at *2 (N.D. Cal. June 23, 2017) ("*Criterion*"). SEC Rule 13d-5, which implements and clarifies § 13(d), defines a "group" as "[w]hen two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer." 17 C.F.R. § 240.13d-5(b)(1). "[T]he group formed thereby shall be deemed to have acquired beneficial ownership . . . of all equity securities of that issuer beneficially owned by any such persons." *Id.*

At bottom, the operative question under this definition is whether the parties "agree[d] to act together for the purpose of acquiring, holding, voting or disposing of [the relevant issuer's] common stock." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 124 (2d Cir. 2001) (internal quotation omitted); *cf. Lowinger v. Morgan Stanley & Co. LLC*, 841 F.3d 122, 130 (2d Cir. 2016) (holding lock-up agreement alone insufficient to form a group of beneficial owners). "Whether the requisite agreement exists is a question of fact. The agreement may be formal or informal and may be proved by direct or circumstantial evidence." *Quintel*, 249 F.3d at 124. The group "need not be committed to acquiring, holding, voting, or disposing of securities on a specific set of terms." *Morales v. Freund*, 163 F.3d 763, 767 n.5 (2d Cir. 1999). "All that is required is that the members of the group have combined to further a common objective with regard to one of those activities." *Id.*; *see also Quintel*, 249 F.3d at 124; *Roth*, 489 F.3d at 508. "Evidence that group members might not always made [sic] identical investment decisions does not preclude existence of agreement." *Goldstein v. QVT Assocs. GP LLC*, No. 10 CIV. 2488(HB), 2010 WL 4058157, at *4 (S.D.N.Y. Oct. 15, 2010) (internal quotation omitted).

### 2. Definition for Purpose of Short-Swing Liability under Section 16(b)

"Once a person is deemed a corporate insider, the second definition of beneficial owner comes into play for purposes of the short-swing-profit liability provisions of Section 16. It defines 'beneficial owner' as 'any person who, directly or indirectly . . . has or shares a direct or indirect pecuniary interest in the equity securities . . . .'" *Berkowitz*, 2017 WL 6343685, at *2 (quoting 17 C.F.R. § 240.16a–1(a)(2)). The SEC rules define pecuniary interest as "the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities." 17 C.F.R. § 240.16a–1(a)(2)(i). An example of a possible pecuniary interest is a "performance-related fee, other than an asset-related fee, received by . . . [an] investment manager." *Id.* § 240.16a–1(a)(2)(ii)(C).

### III. Discussion

In light of the definition of a "beneficial owner," the question presented by defendants' motion to dismiss is solely whether the Complaint adequately alleges an agreement between the IVA Defendants and John Doe to act together for the purpose of acquiring, holding, voting or disposing of DeVry's common stock. If so, given the 19.5% stake that the IVA Defendants and John Doe are pled to have together held in DeVry common stock and the IVA Defendants' admitted control purpose with respect to DeVry, Doe qualifies as an insider under § 16(b) as part of a "group" with the IVA Defendants. If not, Doe—in whose account alone the subject trading occurred—does not so qualify.[7]

Rubenstein makes two arguments why an agreement along these lines can be inferred: one based on the IVA Defendants' authorization to manage the JD Account, and the other based on the IVA Defendants' announced control purpose. The Court addresses these in turn.

### A. IVA's Authorization to Manage the JD Account Alone

Rubenstein first argues that IVA's authority to manage the JD Account supports the inference that John Doe agreed with IVA and/or IVA's other clients to trade DeVry shares as a group within the meaning of § 13(d) and Rule 13d-5(b)(1).

The Complaint's allegations regarding the arrangement between IVA and John Doe are sparse. At bottom, the Complaint alleges only that IVA had authorization from Doe to manage the JD Account, that is, to make investment and voting decisions for it. *See, e.g.*, Complaint ¶ 4 ("The John Doe Defendant is the owner of a brokerage trading account holding shares of DeVry

---

[7] Rubenstein emphasizes that the IVA Defendants cannot avail themselves of the exception in Rule 16a-1(a)(1) for registered investment advisors. That is correct but beside the point, because the IVA Defendants do not invoke that exception—nor could they, given that IVA has disclosed a control purpose with respect to DeVry. *See* Dkt. 34. The IVA Defendants instead argue that, based on the allegations in the Complaint, John Doe never "agreed" to form a "group" with the IVA Defendants with respect to DeVry shares. The Court confines its analysis to this question.

common stock, and managed with respect to the acquisition, holding, voting, and disposition of shares, by the IVA Defendants."); *id.* ¶ 14 ("IVA is an investment advisor and serves as the investment manager for various managed accounts, including the Managed Account held on behalf of and by agreement with the Managed Account Owner named as the John Doe Defendant."); *id.* ¶ 15.

These allegations do not permit the inference necessary to make John Doe part of a group for purposes of § 16(b) liability. For the following reasons, Rubenstein's necessary theory—that an entity's service as an investor advisor, without more, makes the entity and a client for whom it invests together a "group" within the meaning of § 13(d) and Rule 13d-5(b)(1)—is at odds with the text and purposes of those provisions and the applicable case law.

"The touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective." *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982). "[T]he beneficial ownership rule seeks to 'prevent a group of persons who seek to pool their voting or other interests . . . from evading' Section 13(d)'s disclosure requirements. *Lowinger v. Morgan Stanley & Co. LLC*, 841 F.3d 122, 132 (2d Cir. 2016) (quoting *Wellman*, 682 F.2d at 366); *see also Dreiling v. Am. Online Inc.*, 578 F.3d 995, 1002 (9th Cir. 2009); S. Rep. No. 550, at 8 (1967). The question then is what, if any, common objective or objectives can be inferred from the arrangement between IVA and John Doe as pled.

The Complaint's allegations certainly cannot support a claim of a "common objective" of any sort between Doe and the holders of any other accounts that the IVA Defendants managed or owned that had any investment stake in DeVry. The hiring by separate investors of the same investment advisor does not imply any form of agreement among these investors. *See Criterion*, 2017 WL 2720208, at *6–7 (declining to find a "group" even where complaint alleged that the

investment advisor "employed a common investment strategy" for a number of funds and made trades for those funds "in virtual lockstep" with one another). Nothing about different clients' retention of the same investment advisor inherently suggests common goals among these clients, any more than retention of a common lawyer suggest common goals among legal clients. Investors may have vastly different investment priorities, different tolerances for risk, different time horizons, different liquidity constraints, and different tax concerns. For a complaint to plead a common objective among an advisor's clients—let alone the objective of "act[ing] together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer," 17 C.F.R. § 240.13d-5(b)(1)—much more would need to be pled.

Rubenstein alternatively argues that the arrangement between John Doe and IVA supports treating at least the two of them as a 13(d) "group." As to an agreement between John Doe and the IVA Defendants, the allegations in the Complaint here—to the effect that IVA managed the JD Account with respect to the acquisition, holding, voting, and disposition of shares in it—do support inferring *some form* of agreement and common objective. But these allegations suggest no more than John Doe and the IVA Defendants shared a common objective regarding the purchase, sale, holding, and voting of the securities in the JD Account. Such an agreement does not imply an intent to "pool" the voting interests (or other interests) of the shares owned by JD with shares owned or otherwise controlled by IVA—let alone "pool" those interests in any particular security, such as DeVry stock. Under the applicable regulations, more is needed to make out the allegation of a "group" necessary to support liability under § 13(d) and its implementing Rule 13d-5(b)(1).

Rule 13d-5(b)(1) provides that "[w]hen two or more persons agree to act together for the purpose of acquiring . . . securities *of an issuer*, the group formed thereby shall be deemed to

have acquired beneficial ownership . . . of all equity securities *of that issuer* beneficially owned by any such persons." 17 C.F.R. § 240.13d-5(b)(1) (emphasis added); *see also* 15 U.S.C. § 78m(d)(3) (also using the language "securities *of an issuer*" (emphasis added)). Each of these provisions pointedly uses the phrase "of an issuer" or "of that issuer" to modify the word "securities." These provisions thereby require the members of the "group" to have agreed to act together for the purpose of acquiring not just any security, but securities of a particular issuer.

The Complaint here, however, is devoid of that allegation or any remotely close. The Complaint does not allege, for example, that John Doe invested knowing of IVA's other positions in DeVry or of a particular investment strategy by IVA regarding DeVry. In fact, it does not allege that Doe's agreement with IVA envisioned any particular investment, let alone the investment at issue in DeVry securities—or even that John Doe was *aware* of IVA's decision to invest the JD Account in DeVry. The Complaint alleges no more than the fact that Doe delegated investment authority to the IVA Defendants that was broad enough to permit IVA to decide to invest money from the JD Account in DeVry securities (presumably as it could similarly have chosen to invest such money in thousands of other securities).

That is not enough. Every Second Circuit case that has found a "group" under Rule 13d-5(b)(1) has found an agreement to act together for the purpose of acquiring, holding, voting, or disposing of the securities of a particular issuer. *See, e.g.*, *Roth*, 489 F.3d at 510–12 (finding "group" where allegations were of a loan agreement for purpose of allowing purchase of shares in MMI); *Freund*, 163 F.3d at 767 (finding "group" where one defendant "pledged to use its best efforts to secure voting control of New Valley common stock for" co-defendant); *Quintel*, 249

F.3d at 125–26 (finding "group" where allegations were of an agreement for purpose of allowing purchase of shares in Quintel).[8]

The limited case law involving the delegation of investment authority to an investment manager—and whether it, alone, suffices to create a "group" between the investment manager and its investors under § 13(d)—is largely in accord with this holding. Most apposite, two district courts in the Northern District of California have considered this question. Each held that the answer is no. *See Criterion*, 2017 WL 2720208, at \*7 ("The assertion that Criterion employed a common investment strategy in managing the portfolio investments of the Master Funds does not plead facts showing the existence of an agreement to engage in group activity specifically with regard to Veeva securities.") (internal quotation and citation omitted); *Brian B. Sand & Zachary B. Sand Joint Tr. v. Biotechnology Value Fund, L.P.*, No. 16-cv-01313-RS, 2017 WL 3142110, at \*6 (N.D. Cal. July 25, 2017) ("*Biotechnology*") ("While sufficient allegations that multiple stockholders all agreed with each other to delegate authority to a single decision maker for the purpose of disposing of a stock may well be enough to plead the existence of a section 13(d) group, shares among multiple clients of an investment advisor cannot be aggregated when the basis for doing so is . . . the mere fact that there is a shared investment advisor.") (internal quotation omitted). The courts there each reasoned, in identical language:

---

[8] Two cases from this District have applied found a "group" without inquiring about agreement within the group with respect to a particular issuer. But each is distinguishable in that there was common ownership or control over the entities in the "group." *See, e.g.*, *Greenfield v. Cadian Capital Mgmt.*, LP, 213 F. Supp. 3d 509, 518 (S.D.N.Y. 2016) (shared single decision maker, all managed out of same office with same employees); *Strauss v. Am. Holdings, Inc.*, 902 F. Supp. 475, 476 (S.D.N.Y. 1995) (president and CEO of one entity was sole general partner of the other). These cases can be read to permit a group with a common or symbiotic objective to be more readily implied among entities with shared ownership or control. In any event, it does not appear that the defendants in either *Greenfield* or *Strauss* argued that, or the court in those cases had occasion to consider whether, the statutory and regulatory text required a common objective as to a particular issuer.

> [This] theory would necessarily lead to the result that anyone who enters into an investment advisory agreement with an RIA [(registered investment advisor)] would form a Rule 13(d) group with the RIA and any other clients of the RIA who purchased shares of the same company's stock. This is plainly not what is set forth in § 13(d) or Rule 13d-5.

*Criterion*, 2017 WL 2720208, at *7; *Biotechnology*, 2017 WL 3142110, at *7.

Rubenstein did not meaningfully address either of these decisions in his brief, but at argument, sought to distinguish them on the ground that the investment manager here, IVA, has acknowledged its control purpose as to DeVry. That argument fails for two reasons. First, it does not distinguish the decision in *Biotechnology*. The investment advisor there, like IVA, had a well-pled "control purpose" regarding the stock at issue. For this reason, it, like IVA, could not defend based on the separate statutory exception for registered investment advisors who lack such a purpose, *id.* at *3; *see note 7, supra*. The district court in *Biotechnology* nevertheless rejected the plaintiff's claim that the owner of a managed account, through the delegation of investment discretion, had entered into a "group" with his investment advisor. *See Biotechnology*, 2017 WL 3142110 at *5–7.[9] More fundamentally, as both the *Biotechnology* court and now this Court have reasoned, the fact that an investment advisor has a particular control objective does not itself logically speak to the intentions of any of its clients, let alone warrant the inference of an agreement between the client and the advisor with respect to a particular issuer.

---

[9] In *Biotechnology*, multiple account owners were alleged to have collectively formed a group with the RIA. Because the RIA itself had a 10% beneficial ownership of the stock at issue, any individual account owner found to have had entered into a "group" with the RIA would have been subject to potential § 16(b) liability. *See id.* at *5–6.

One case superficially assists Rubenstein: *Goldstein v. QVT Associates, GP LLC*, No. 10 Civ. 2488 (HB), 2010 WL 4058157 (S.D.N.Y. Oct. 15, 2010).[10] There, Judge Baer found that a group of five "interrelated" entities who shared an investment manager were part of a § 13(d) "group." *See id.* at *1, *5. The facts of *Goldstein*, however, are elusive, and appear to support distinguishing that case. The court in *Criterion* distinguished *Goldstein* on the grounds that *Goldstein* involved "a single individual [that] was a managing member of the investment manager, in addition to being a managing member of the investment funds' shared general partner." *Criterion*, 2017 WL 2720208, at *8. If so, that fact would decisively distinguish *Goldstein*. On its face, however, *Goldstein* does not reveal that fact. The only relationship that it explicitly identifies between the fifth entity, QVT Overseas Ltd., and the other "related" entities is their shared investment advisor. *See Goldstein*, 2010 WL 4058157, at *1. On the other hand, *Goldstein* strongly hints that more of a connection between those entities existed, insofar as it states—in a proposition in conflict that with Rubenstein's thesis here—that "[a] bare allegation of common control is, standing alone, insufficient to give rise to an inference of the agreement that is necessary to an existence of a Section 13(d) group." *Id.* at *5.[11] Suggestive, too, that *Goldstein* is factually well afield from this case is Judge Baer's observation in *Goldstein* that the court had "face[d] a similar situation" in *Strauss v. American Holdings, Inc.*, 902 F. Supp. 475 (S.D.N.Y. 1995), which *Goldstein* cites (in part) for its holding that a "group" had been formed

---

[10] Rubenstein separately has relied on *Packer on Behalf of 1-800-flowers.com, Inc. v. Raging Capital Mgmt., LLC*, 242 F. Supp. 3d 141 (E.D.N.Y. 2017), but at issue there was defendants' eligibility for the RIA exemption, not whether they constituted a "group" under § 13(d) and Rule 13d-5(b)(1). *See id.* at 143, 148–50.

[11] Many of the five interrelated entities also shared similar names. *See Goldstein*, 2010 WL 4058157, at *5 (listing defendants as: (1) "Quintessence Fund L.P.," (2) "QVT Associates LP," (3) "QVT Global II L.P.," (4) "QVT Associates GP LLC," and (5) "QVT Overseas Ltd.").

between a corporation and limited partnership where the president and CEO of the corporation was also the general partner of the limited partnership. *See Goldstein*, 2010 WL 4058157, at \*5. And *Goldstein* nowhere affirmatively defends the proposition necessary to Rubenstein in this case: that the delegation of investment authority, alone, can supply a basis for inferring agreement between an investment manager and its client within the meaning of § 13(d) and its implementing regulations.

In the end, the Court holds, in tandem with the courts in *Biotechnology* and *Criterion*, that a complaint that asserts no more than delegation of investment authority to an investment advisor does not permit the inference of an agreement between the client and the advisor (or between the clients themselves) with respect to "act[ing] together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer." 17 C.F.R. § 240.13d-5(b)(1). Such a joint objective does not naturally follow from such an arrangement. And while the Court does not find ambiguity on this point, if it did, the Supreme Court's admonition to adhere to section 16(b)'s "narrowly drawn limits" would point to the same end. *See Gollust*, 501 U.S. at 122.[12] The delegation of investment authority to an investment advisor, alone, does not suffice to create a "group" under § 13(d) and Rule 13d-5(b)(1).

---

[12] Rubenstein suggests that this outcome invites mischief from registered investment advisors who are 10% beneficial owners and have control purposes with respect to an issuer, insofar as such advisors could still obtain short-swing profits for their clients in such accounts. It is not clear that this situation presents at all a common circumstance. And there is a significant disincentive to such conduct. An advisor with a pecuniary interest in the client's account risks liability under § 16(b) for such trading independent of whether they have formed a "group" with their clients, potentially requiring disgorgement of the investment advisors fees attributable to the short-swing trades. *See* 17 C.F.R. § 240.16a–1(a)(2). The Complaint here, while conclusorily alleging that IVA had a pecuniary interest in the J.D. Account, *see* Compl. ¶ 8, pursued only a theory of "group" liability. In any event, the Court understands that Rubenstein—having been furnished a copy of the management agreement between IVA and John Doe—no longer contends that IVA had a pecuniary interest in that account. *See* Dkt. 36.

## B.    Control Purpose

Rubenstein alternatively appears to allege that an agreement was formed between John Doe and the IVA Defendants by virtue of IVA's control purpose. *See* Compl. ¶ 24 (alleging that Doe "understood, agreed to, and authorized—either affirmatively, or through silence and the continued designation of the IVA Defendants as their agents and discretionary investment managers—the DeVry 'change of control' strategy").

This theory can be quickly interred. The Complaint's allegation that Doe "agreed to" and "authorized" IVA's "strategy" with respect to DeVry is the sort of unsupported "label" or "legal conclusion[]" which the Court need not accept as fact. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. And the Complaint does not elsewhere allege any facts to support this thesis. It does not allege facts to suggest that Doe was aware of, let alone agreed to, the IVA Defendants' control purpose. It does not, for example, allege that Doe read the Schedule 13D (of which John Doe was not a signatory), or that he was in involved in its drafting or filing. Nor does it allege that the IVA Defendants notified Doe about their goals with respect to DeVry. There are, in short, no facts pled from which any agreement by Doe with respect to DeVry can be inferred.[13]

IVA Defendants' disclosure of a control purpose regarding DeVry did not form a "group" between them and John Doe.

---

[13] Rubenstein cites *Seilon, Inc. v. Lamb*, No. C 83-314, 1983 WL 1354 (N.D. Ohio July 27, 1983), as a decision inferring consent to join an investment manager's group from silence by potential group members. *See* Pl. Br. at 11. *Seilon* is easily factually distinguished. Inferring consent there, the Court held that a wife had formed a group with her husband (who managed her assets), his daughter, and his "close personal and business associate." *Seilon*, 1983 WL 1354, at *1, *3, 14. There is no claim of any such special or intimate relationship here between the investment manager and the client. On the contrary, IVA is a large corporation that manages many different accounts, and the Complaint does not so much as identify whether John Doe is a corporeal, as opposed to a corporate, entity.

**CONCLUSION**

For the foregoing reasons, the Court dismisses the Complaint in its entirety. The Clerk of Court is respectfully directed to close the motion pending at Dkt. 14 and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: February 5, 2019
New York, New York